POLYGRAM RECORDS, INC., Plaintiff,

v.

BUDDY BUIE PRODUCTIONS, INC. and Ron Hammond, James Cobb, Barry Bailey, Dean Daughtry, Robert Nix, and Paul Goodard, together p/k/a the Atlanta Rhythm Section, Defendants.

No. 81 Civ. 4781.

United States District Court,
S. D. New York.

Aug. 21, 1981.

Barovick, Konecky, Braun, Schwartz & Kay, New York City, for plaintiff; John S.

Siffert, Todd I. Gordon, New York City, of counsel.

Siegert & Grillo, New York City, for defendants; Paul Siegert, New York City, of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, Polygram Records Inc. ("Polygram") is in the business of exploiting, marketing and selling phonograph records. Buddy Buie Productions Inc. ("BBP") is a production company which produces and furnishes the recording services of the five individual defendants, a rock and roll music band, professionally known as The Atlanta Rhythm Section ("ARS").[1] Perry C. Buie, "Buddy" Buie ("Buie") has been the President of BBP since its formation. BBP, under an agreement with the individual defendants, is entitled to their exclusive services in the recording of phonograph records. Polygram, BBP and the individual defendants had a contractual relationship commencing in 1973 under which Polygram became the exclusive recording company for all ARS records.

The 1973 agreement was superseded by another on October 1, 1977 (the "1977 agreement") under which the defendants again granted plaintiff Polygram the exclusive right to all ARS recordings during the existence of the agreement. Under its terms BBP was obligated to produce and deliver four albums of ARS master recordings to plaintiff for its exclusive exploitation, manufacture and distribution.

Plaintiff commenced this action upon a claim that the defendants breached their exclusive service agreement by entering into an agreement in May 1981 with CBS Records Inc., a competing record company. Plaintiff seeks to enjoin the defendants from producing or recording any records for CBS or any other recording company, and money damages.[2] Plaintiff can prevail only if the 1977 agreement was in effect at the time of the alleged breach. The parties are in agreement that the resolution of this issue depends upon whether plaintiff timely and properly exercised an option to extend the agreement for a further period so that it was in effect when defendants entered into their agreement to record for CBS.

The initial period of the 1977 agreement was for a term beginning October 1, 1977 and ending 180 days subsequent to the delivery by BBP to Polygram of master recordings for the fourth and final ARS album. Polygram had an option to extend the agreement for a further term covering four additional albums by sending a written notice to BBP at least 30 days prior to the date that the contract otherwise would expire. Since the agreement by its terms expired 180 days after the delivery of the fourth album, the date of delivery is crucial on the issue of whether the option was timely exercised so that plaintiff was entitled to ARS' exclusive services at the time of the alleged breach.

Delivery under the agreement required BBP to "deliver completed, edited and fully mixed master tapes in accordance with the Company's reasonable instructions"[3] comprising

a two-track stereo and a discrete quadraphonic master tape for each Master recorded hereunder together with a "reference lacquer" therefor, which tape shall be fully edited, mixed and leadered prior to delivery to Company [Polygram] so that they are in proper form for the production of parts necessary for the

---

1. A sixth individual, originally a member of the group, was also named as a defendant but since at the time of events referred to herein he no longer was a member, the action, as to him, was dismissed with prejudice.

2. On plaintiff's motion for a preliminary injunction, the Court, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, ordered a trial on the merits.

3. Contract ¶ 3(d).

manufacture of commercial Phonograph Records.[4]

The defendants contend that they made delivery of the last and fourth album in accordance with the foregoing contract provisions by delivery on June 11, 1981 of a reference lacquer[5] to plaintiff at its offices where it was played in the presence of various Polygram executives who approved and accepted it and on that day mailed a check for $150,000 to BBP as the final payment.

The plaintiff, contrariwise, contends that the reference disc played and delivered on June 11, 1980 was an "unapproved" disc and that the final approved reference disc was not delivered and accepted by it until June 17, 1980. Accordingly, plaintiff claims that its notice of exercise of the option mailed on November 14, 1980, was sent on the 150th day after delivery, within the required time for the exercise of the option and hence the contract was renewed for a further term and was in effect in May 1981, the date of the alleged breach by the defendants. The defendants not only dispute that June 17, 1980 was the date of delivery but they challenge that in fact the notice was mailed on November 14, 1980. The envelope in which the exercise of option letter was mailed bears a November 16 postmark and was received by BBP on November 18. Two days later, on November 20, defendants' counsel notified Polygram orally and in writing that plaintiff had not timely exercised its option and that the defendants deemed the agreement terminated. Plaintiff made no response to defendants' disavowal until two months later when, on January 19, 1981, it notified all recording companies that a contract existed between plaintiff and the defendants. Thus a threshold question is on what day, June 11 or June 17, 1980, delivery was made by BBP to plaintiff of a completed master tape and reference lacquer as required by the provisions of the contract.

Masterdisk Corporation is a disc-cutting studio where the final artistic changes are made in a recording. The artist's product is originally recorded on many different tracks and subsequently "mixed down"— that is, reduced to a two-track tape which is then taken to a mastering facility, such as Masterdisk, where final sound adjustments are made. A reference disc and a master disc are produced. The reference disc is used so that it may be heard by those interested in the product either for approval or suggested changes or modifications. The master disc is retained by the studio and upon approval is sent to a plating plant where it is used to manufacture the record that is sold to the public. Masterdisk was the studio used for the mastering of the ARS recordings. The parties' practice with respect to the first three albums was that the final two-track tape, after mastering, was left at Masterdisk and, upon final approval, Polygram would contact Masterdisk and order "the parts"[6] necessary for the production of the album. This was the procedure followed with respect to the fourth album, the subject matter of this action.

Plaintiff, to support its claim that June 17, 1980 is the effective delivery date, relies in the main upon the testimony of two witnesses, Stuart Fine, then its East Coast Director of Artists and Repertoire, and James Del Balzo, then its Assistant National Album Promotion Manager. Fine testified in substance that on June 11, 1980, Buddy Buie, who mastered the recordings of the artists, came to his office together with Ronnie Hammond, lead singer of the ARS artists, and their respective wives, and played, in his presence and at times in the presence of other executives, a reference disc which Buie said he had been working on the previous two days; that before other Polygram people joined the meeting Buie

4. *Id.* ¶ 11(a).

5. A reference disc or reference lacquer is a copy of the master tape which remains with a disc-cutting studio, discussed more fully hereafter.

6. "Parts" is a record-business term for master lacquer.

told him that there were still some changes to be made; that he had "to roll off the bottom end";[7] that he would be working with Bob Ludwig, Masterdisk's chief engineer, later that day at Masterdisk to effect the changes, and that what they would be listening to was an unapproved reference disc. Fine acknowledged that everybody who heard the record liked it. Finally, he testified that after Buie and Hammond left the office, he wrote upon the cover of the reference record "not approved." However, he did not inform any superior or anybody else that it was not approved.

Fine also testified that later that day Arnold Geller, co-manager of ARS, telephoned and advised him that Buie and Ludwig would make the final changes and Polygram was not to place the order for final parts until it received from Buie another reference disc or Fine heard from defendants. Fine stated that he did nothing further until Geller called him on June 17 and gave BBP's approval, whereupon Fine voluntarily waived further Polygram approval and sent the "reference" approval form to the production department so they would "order parts" and commence commercial production of the album.

Del Balzo testified that on June 11 he was present when Buie played the reference record and asked Buie for cassettes of the record, to which Buie responded, "no, it was not an approved record." Finally, in addition to the reference approval form, plaintiff offered other internal documents to support its claim that Polygram regarded June 17, 1980 as the delivery date. Based in large part upon the foregoing testimony and related events, plaintiff contends that the date of delivery was June 17.

Defendants' evidence is in sharp contradiction to that of plaintiff. Buie testified that on June 9 and 10 he and Bob Ludwig, the engineer at Masterdisk, worked there in producing a reference lacquer and two-track tape which were completed and in final and satisfactory form on June 10; that on June 11, accompanied by Hammond and their respective wives, he went to the Polygram offices for the purpose of delivering the reference lacquer to Polygram, to share his excitement about the record with company officials, and to obtain final payment of $150,000. He delivered the record to Fine in his office, where it was played for Fine and other Polygram executives, including Freddie Haayan, its President; that all who heard it were enthusiastic and ecstatic about the record; they, as well as he, approved the record, and Haayan was so enthusiastic that he asked for a cassette that Buie had in his hand. Buie categorically denied the testimony of Fine and Del Balzo that he said the reference disc was "unapproved" or that he had to "roll[ ] off some bass." Buie testified that nothing further was to be done on the record and that he did not return to Masterdisk at any time thereafter for the purpose of making any changes. He expected to receive payment of $150,000 of the balance due under the contract,[8] then and there, but Ms. Barbara Patralites, contract administrator, said there had been a foul up and she would express mail the check to Atlanta. The next day, June 12, he received plaintiff's check for $150,000 accompanied by a letter dated June 11, which reads:

> Pursuant to paragraph 9(a)(ii) of the above-cited Agreement enclosed please find Polydor's check No. 219756 in the amount of $150,000.00 representing the balance due upon delivery of the 4th LP entitled "The Boys From Doraville."

The letter was signed by Ms. Patralites, who testified the check was drawn by her pursuant to instructions from Dr. Ekke Schnable, Senior Vice President, Legal & Business Affairs. The check stub contains

---

**7.** In musical terms this means to change the equalization levels so that the volume of the bass sound of the instruments would be lowered.

**8.** Paragraph 9 of the Agreement required Polygram to pay BBP $250,000 in two installments for each album delivered. One hundred thousand ($100,000) upon commencement of recording and the balance ($150,000) within ten (10) days following the receipt of technical acceptance by Polygram of the fully mixed and edited tapes.

the legend "ADVANCE DUE UPON DELIVERY OF THE 4TH LP BY THE ATLANTA RHYTHM SECTION PURSUANT TO PARAGRAPH 9(a)(ii) OF THE OCTOBER 1, 1977 AGREEMENT." In sum, Buie testified that the reference lacquer left with Fine and the master two-track tape left at Masterdisk were fully edited, mixed and leadered and were in proper form for the production of the parts necessary to make commercial phonograph records and that there was no further work to be done.

Hammond also testified and denied that he heard any discussion on June 11 as to the reference lacquer being either unapproved or unsatisfactory; that all those who listened to the album were "very excited" about it. He acknowledged he did not hear any conversation Buie may have had with Fine or Del Balzo.

Arnold Geller, co-manager of ARS, also testified and flatly denied that he told Fine that further work was required on the reference disc or that he called him to give BBP approval on June 17, 1980. Geller stated that he had acknowledgment from several senior officers of Polydor;[9] that they had received the album, loved the album and accepted it.

The General Manager and Vice President of Masterdisk, Douglas Levine, whose duties included overseeing all work performed there, testified, based on company records and his own knowledge, that no work was done by Masterdisk on the records between June 11 and June 17, 1980 except on June 12 when, in response to Buie's request, a duplicate reference disc was made to replace the one Buie had lost on a plane trip on his way home to Atlanta, Georgia on June 11th. According to the company records, all work was completed on the records on June 10 and there was no further work to be done on them.

The plaintiff has the burden of proof to establish by a fair preponderance of the credible evidence the existence of the contract under which it claims to be entitled to injunctive relief and damages.[10] Based upon an appraisal of the demeanor of the witnesses, notes made during the trial, a word-by-word re-reading of the trial transcript, analysis of the exhibits and consideration of all surrounding circumstances, the Court concludes that at best the credible evidence is in balance, in which circumstance, as juries are instructed, the party who has the burden of proof on an issue has failed to sustain it.[11] But the Court further finds that the credible evidence preponderates in favor of the defendants and against the plaintiff—a finding buttressed by circumstances that are not in dispute.

First, the reference record left with Fine on June 11 and retained by him was exactly similar to the master two-track disc produced by Masterdisk and used for the commercial production of the record upon plaintiff's order. In sum, no changes were made in the record as produced for distribution, a circumstance that in some measure challenges the testimony that the reference delivered to plaintiff on June 11 was "unapproved." Further, contrary to Fine's testimony that Buie said further work was to be done on the record and that he planned to return to Masterdisk for that purpose, the evidence establishes that Buie never returned there for that purpose.

Second, the mailing on June 11, after delivery of the reference disc to plaintiff, of the balance of $150,000 accompanied by a letter specifically stating it represented "the balance due upon delivery of the 4th LP" and a similar legend on the check stub.

9. Polydor is one the record labels used by Polygram.

10. *Rinaldi & Sons, Inc. v. Wells Fargo Alarm Service, Inc.*, 39 N.Y.2d 191, 196, 347 N.E.2d 618, 383 N.Y.S.2d 256 (1976); *Burch v. Reading Co.*, 240 F.2d 574, 578–79 (3d Cir. 1957); *cf., Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 111, 62 S.Ct. 156, 161, 86 L.Ed. 89 (1941).

11. If at the close of the case, the evidence is equally balanced on an issue as to which a party has the burden of proof, it has failed to sustain its burden and cannot prevail. *Rinaldi, supra*, 39 N.Y.2d at 196, 347 N.E.2d 618, 383 N.Y.S.2d 256.

Although Fine knew that the final payment was to be made upon delivery, he did not inform anyone that the reference disc was "not approved" and did nothing to hold up the check.

Third, the plaintiff's failure to call as a witness at the trial Dr. Ekke Schnabel, to testify as to the circumstances attendant upon his direction for the issuance of the final payment check or to offer any explanation for his failure to testify at the trial.[12]

Fourth, the plaintiff's failure to call as a witness Freddie Haayan, plaintiff's President, who, it was testified, was one of those who expressed approval of the record on June 11th, or to offer any explanation for his nonappearance as a witness.

Fifth, the failure over a period of almost two months to respond to defendants' letter of November 20, 1980 which rejected plaintiff's option notice of November 14 on the ground that plaintiff had "not timely exercised its option to extend the term of the agreement" and that defendants regarded the agreement as terminated. Significantly, this letter was addressed to the attention of David Braun, plaintiff's President at that time, a lawyer, with a copy to Eileen Garrish, also a lawyer and who, at the time, was Director of Legal and Business Affairs of Polygram and had drafted the option notice. Surely the significance of the defendants' denial that the contract had been extended could not have been lost upon Braun and Garrish. Common experience suggests that these plaintiff's executives, also lawyers, would have responded immediately and on the record rejected defendants' claim and would affirmatively have asserted plaintiff's position that the option notice had been timely and by reason thereof that the contract had been extended for another term. David Braun was not called as a witness nor any explanation offered for his nonappearance. Eileen Garrish did testify principally with respect to the mailing of the notice on November 14. However, with respect to defendants' November 20 letter,

when asked why no response was made thereto she testified that she had been instructed by her superiors "not to do anything." It is rather singular that when defendants denied the effectiveness of the option notice and the renewal of the contract, two lawyers who were directly involved in the matter on behalf of plaintiff failed to assert plaintiff's basic position over a two-month period.

Upon the totality of all the credible evidence, the Court finds that the defendants made delivery to plaintiff on June 11, 1980 of the fourth and final album in accordance with the terms of the 1977 agreement and that plaintiff accepted such delivery on that day. The complaint is dismissed upon the merits and judgment may be entered accordingly.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.

---

12. Plaintiff's attempt to explain the payment was that payment is sometimes given in advance of delivery. In the case of ARS this was done once in the past; but in that instance, only *partial* final payment was made.