**Peter SIMS, Plaintiff,**

v.

**BLANCHRIS, INC., Muse Records and Joseph Fields, Defendants.**

**No. 86 Civ. 1019 (MP).**

United States District Court, S.D. New York.

Dec. 9, 1986.

Peter Sims, New York City, pro se.

Frank Taddeo, Jr., New York City, for defendants.

MILTON POLLACK, Senior District Judge.

This case was tried to the Court at a Bench trial. The suit is brought under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Jurisdiction is invoked pursuant to 15 U.S.C. § 1121.

Plaintiff, appearing *pro se*, alleges what essentially boils down to four claims: (1) unfair competition and false designation of origin under section 43(a) of the Lanham Act, (2) defamation, (3) breach of a contract for royalties, and (4) infliction of mental and emotional distress.

## FACTS

Peter Sims, the plaintiff in this action, is an orchestral drummer who turned to the study and practice of law. On or about May 25, 1967 Sims, then known professionally as "Pete La Roca," performed with three other musicians for master recordings made by Alan Douglas of the Douglas International Corporation of New York ("Douglas"). Plaintiff played the drums, John Gilmore played tenor saxophone, Walter Booker was bassist, and Chick Corea was the pianist. Mr. Corea has gone on to substantial national and international fame.

Douglas embodied the master recordings in an album he produced and entitled "Turkish Women at the Bath." The album contained seven jazz compositions written by plaintiff Sims; one of these is entitled "Bliss."

Plaintiff claims that when the album was recorded in 1967 he signed an agreement with Douglas providing that Douglas would pay to Sims as a royalty 10% of the wholesale price or 5% of the retail price of the records and tapes sold which embodied the recorded performances and compositions. The alleged agreement was not produced at the trial and its absence was insufficiently accounted for.

In 1972 Douglas conveyed all of its right, title, and interest in the master recording to Brooke Productions, Inc. of Malvern, Pennsylvania. Between April 1973 and December 1973 Brooke effected a conveyance of all of its right, title, and interest in the master recording to defendants Muse Records of New York, a division of Blanchris, Inc., and Joseph Fields, president of Muse.

Upon receiving the masters, defendants in 1973 released the masters in an album entitled "Bliss! Chick Corea" (referred to hereafter as the "Original Muse Album"). On the front cover of this album, immediately below the title and in smaller type, there appeared the names "John Gilmore, Walter Booker, Pete La Roca." Below these names is a picture of the musician Chick Corea, apparently taken in a music studio.

The back cover of the liner notes of the Original Muse Album included paragraphs, the substance of which breaks down as follows: ¶ 1–¶ 3, general remarks introduced by a Corea quote; ¶ 5–¶ 6, remarks on Corea; ¶ 7–¶ 10, remarks regarding the other three musicians including the statements that "the date was originally contracted under the drummer's name," and, "Yet for one reason or another, La Roca became disenchanted with the jazz life and quietly disappeared from the scene."

Late in 1973, after MUSE released the Original Muse Album, plaintiff brought an action in this court against Muse and Joseph Fields, 73 Civ. 5395 (MP), alleging claims for unfair competition, trademark infringement, and defamation arising from Muse's release of the album.

On April 3, 1975 the parties settled that action, and plaintiff signed a general release reading in full as follows:

PETER (LA ROCA) SIMS, in consideration of the sum of twenty-five hundred ($2,500) dollars received in full by him from Muse Records, Inc. and Joe Fields, hereby remises, releases and forever discharges Muse Records, Inc., and Joe Fields, individually, from all actions, causes of action, suits, debts, contracts, agreements, promises, damages, claims and demands whatsoever in law or in equity which Mr. Sims ever had or may now have in respect to the subject matter of the proceedings captioned Peter (La Roca) Sims—v—Muse Records, Inc., a division of Blanchris, Inc., and Joe Fields, President, Music Records, Inc., 73 Civ. 5395 (MJP) [sic], presently pending in the United States District Court for the Southern District of New York. The release may not be changed orally.[1]

■ Plaintiff commenced this action on February 3, 1986, asserting claims virtually identical to those pursued in the 1973 suit. Plaintiff claims that the general release does not bar a suit based on the distribu-

tion of the Original Muse Album *after* April 3, 1975, the date of the release.

## THE LANHAM ACT CLAIM

### A. *Allegations Under the Act*

Plaintiff claims that any alleged distribution and sale of the Original Muse Album constitutes a violation of section 43(a) of the Lanham Act, which provides in part:

Any person who shall affix, apply, or annex, or use in connection with any goods and services ... a false designation of origin, or any false designation or representation ... and shall cause such goods or services to enter commerce ... shall be liable in a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false designation or representation.

15 U.S.C. § 1125(a)

Sims claims that the alleged sale by defendants of the album using the "Bliss! Chick Corea" album cover created an allegedly false impression, that Mr. Corea, rather than plaintiff, was the principal performer on the album. Mr. Sims claims that he was the principal performer, and that Mr. Corea was merely a "sideman" or accompanist. If substantiated, Mr. Sims' allegations of "reverse passing-off" and public confusion regarding the identity of the principal musician on a record album could be actionable under the Lanham Act. *See Smith v. Montoro*, 648 F.2d 602, 605 (9th Cir.1981); *Yameta Co. v. Capitol Records, Inc.*, 279 F.Supp. 582 (S.D.N.Y.), *rev'd*, 393 F.2d 91 (2d.Cir.1968).

However, before questions of misrepresentation and public confusion are considered, a threshold question to be answered under the statute for a finding of liability is whether defendant "cause[d] such goods or services to enter into commerce." 15 U.S.C. § 1125(a); *Blazon, Inc. v. DeLuxe Game Corp.*, 268 F.Supp. 416, 428–430 (D.C.N.Y.1965). Thus, the issue litigated herein was whether defendants caused

---

**1.** The issue of the validity of this release was not before the Court. While this issue may be the subject of separate litigation between the par-

ties, no evidence challenging the validity or enforceability of the release was introduced at trial.

the Original Muse Album to enter commerce at a time which would present plaintiff with an actionable claim.

### B. *The 1975 Release From Liability*

It is clear from the plain language of the April 3, 1975 release executed by plaintiff that he *at least* intended to discharge defendants from any and all causes of actions or claims arising from sales of the Original Muse Album on or before the date of the release. Plaintiff's unambiguous intent to discharge defendant from such claims is controlling, for in construing the meaning and scope of a release the central issue is the intent of the parties. *Ruskay v. Waddell,* 552 F.2d 392, 395 (2d Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *Complaint of American Export Lines,* 620 F.Supp. 490, 516 (S.D.N.Y. 1985). Thus, any claims raised here by plaintiff relating to copies of the Original Muse Album which defendants caused to enter commerce prior to April 3, 1975, the date of the release, are not actionable, for they have been discharged.

### C. *Albums Sold After the Release*

Plaintiff claims that the release is ambiguous as to whether he intended to release defendants from liability for albums which defendants caused to enter commerce *after* April 3, 1975.

Even assuming *arguendo* that plaintiff did not discharge defendants from liability arising from albums entering commerce after April 3, 1975, plaintiff's claim must fail. Plaintiff has not sustained his burden of proof by a fair preponderance of credible evidence that defendant caused the Original Muse Album to enter commerce after the release was signed. The evidence at trial which is credited shows that defendants have not manufactured, sold, or distributed in commerce the Original Muse Album at any time since the release. Testimony by Muse President Joseph Fields established that although approximately 12,-000 copies of the Original Muse Album were produced and entered commerce in 1973, no such albums have been introduced to commerce by Muse since that distribution.

In fact, the evidence showed that in 1974 Mr. Fields, responding to repeated complaints by plaintiff, ordered that a new album cover and new liner notes be designed. The new album was packaged and marketed as "Bliss! The Music of Pete La Roca" ("The Revised Muse Album"). Any albums sold after 1974 embodying the master recording of plaintiff's performances were marketed using this new format. The Revised Muse Album prominently features the name "Pete La Roca" on its cover in large black script lettering. Printed alongside each other in smaller blue print, and underneath La Roca's name, are the names "Chick Corea, John Gilmore, Walter Booker."

Mr. Fields testified that Mr. Sims and his attorneys were aware of the revised packaging in 1974, when the repackaging took place in response to requests by Mr. Sims during settlement discussions. Plaintiff however, asserted that he, at least, was unaware of the existence of The Revised Muse Album until defendant was preparing to move for summary judgment in 1986 in this case.

In any event, The Revised Muse Album could only violate section 43(a) of the Lanham Act if the album cover has a "tendency to mislead, confuse or deceive." *See R.J. Reynolds Tobacco Co. v. Loews Theatres, Inc.,* 511 F.Supp. 867, 874–875 (S.D. N.Y.1980). Assuming *arguendo* that La Roca/Sims is the principal performer on the album, The Revised Muse Album cannot be said to falsely describe or misrepresent that fact. "Pete La Roca" is clearly the principal name appearing on the album cover, which reasonably suggests that it is La Roca who is primarily responsible for the musical content of the album. There is not a "likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question." *See Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 213 (2d Cir.1985).

Consequently, since only The Revised Muse Album was caused by defendant to

enter commerce after the date of the release [2], and that album presents no likelihood of misleading or confusing the public, plaintiff's claim under section 43(a) of the Lanham Act must fail.

## THE DEFAMATION CLAIM

■ Plaintiff claimed in the 1973 case that the liner notes on the Original Muse Album constituted libel *per se*. The language which plaintiff objected to was, "Yet for one reason or another, La Roca became disenchanted with the jazz life and quietly disappeared from the scene." Although any albums sold by defendants after 1974 were marketed using a revised format with new liner notes, the revised liner notes included the language plaintiff objected to.

The general release executed by plaintiff in 1975 discharged defendants from liability arising from dissemination of the Original Muse Album and its liner notes.

Additionally, the language to which plaintiff objected was not libelous, for it was true, as the evidence showed. It is "fundamental that truth is an absolute, unqualified defense to a civil defamation action." *Commonwealth Motor Parts Limited v. Bank of Nova Scotia*, 44 A.D.2d 375, 355 N.Y.S.2d 138, 141 (1974), *aff'd*, 37 N.Y.2d 824, 377 N.Y.S.2d 482 (1975); *see also* W. Prosser, *The Law of Torts* at 796–99 (1971) (discussing defense of truth to alleged libel); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 151–152, 87 S.Ct. 1975, 1989–1990, 18 L.Ed.2d 1094 (1967) (Opinion of Harlan, J.) (history of truth as an absolute defense to libel).

The evidence at trial showed that after performing for the Douglas recording session in 1967 plaintiff failed to find regular employment as a musician. From 1967 to 1970 plaintiff's gainful employment was as a taxi-cab driver in New York City. Plaintiff testified that he attended City College of New York from 1970 through 1972, and in 1973 commenced studies at New York University Law School, where he graduated from in 1975.[3]

When questioned about his employment in the music field from 1967–1973 plaintiff testified at trial that he took certain musical opportunities that came along, including occasional "odd-jobs" as a drummer for certain bands. Plaintiff did not participate in any recording sessions subsequent to the Douglas session and did not perform substantial services as a jazz musician between the time he recorded the album for Douglas and 1973, the date the liner notes were published. Mr. Sims testified that he could possibly have taken jobs as a sideman or accompanist, but refused to seek such employment because he found it largely unsatisfying.

Thus, the weight of the evidence affirms that plaintiff, for one reason or another, was disenchanted or dissatisfied with musical opportunities presented, substantially left the jazz life after the recording for Douglas, and pursued other career paths. *See Korkala v. W.W. Norton & Co.*, 618 F.Supp. 152, 155 (S.D.N.Y.1985) (Under common law and law of New York substantial truth is absolute defense to defamation).

## BREACH OF CONTRACT CLAIM

■ In a contract action, "[t]he plaintiff has the burden of proof to establish by a

---

2. Plaintiff did obtain from defendants, through an apparent emissary, a copy of the obsoleted Original Muse Album in December 1985. Defendant Fields denied knowledge of delivery of the album, but conceded that an album may have been delivered after months of haggling phone requests for the Original Muse Album by plaintiff and his agent. The single album obtained by plaintiff is not actionable herein because (1) there is no credible evidence that this was the format of the albums being offered for sale to the public after 1974, (2) the album was procured solely to substantiate plaintiff's allegations here, and (3) there is no allegation that any consumer was confused as to the source of the album, for plaintiff and his agent knew the nature and source of the goods received.

3. Plaintiff testified that he was briefly employed by the New York City Corporation Counsel during law school. From April 1975 through January 1983 plaintiff's principal employment was for Mead Data Central, first as a Lexis instructor, later as a drafter of contracts and a "troubleshooter."

fair preponderance of the credible evidence the existence of the contract under which it claims to be entitled" to relief. *Polygram Records, Inc. v. Buddy Buie Productions*, 520 F.Supp. 248, 252 (S.D.N.Y.1981). Plaintiff's only evidence of the existence of a contract for royalties is his conclusory testimony that he entered into such a written agreement with Douglas. Plaintiff did not produce a copy of the alleged written agreement. Plaintiff offered no satisfactory explanation for his failure to produce this document, which is vital to his case. Douglas, the alleged signer of the contract, did not testify at trial. Nor could plaintiff recall essential terms of the alleged agreement, including whether a $1,000 payment by Douglas to plaintiff in 1967 represented an advance of royalties, a payment in lieu of royalties, or a payment in addition to any royalties owed.

Relief for an alleged breach of a written contract cannot be granted where the alleged contract has not been produced, plaintiff's testimony regarding the alleged contract is inconclusive, essential terms of the alleged contract are in doubt, and no satisfactory evidence of an alleged breach has been adduced. In view of the absence of the contract it would seem that the interests of justice are best served on this claim by dismissing it without prejudice, so that if new evidence of substance is procured the claim for royalties on albums sold by defendant after 1975 may be reasserted in a proper forum for common law claims.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

██ Plaintiff claims that defendants engaged in acts that were "intentional, malicious and outrageous" that "have caused plaintiff great and severe mental and emotional distress, in violation of the common law of the State of New York." Complaint at ¶ 60.

Under New York Law, a finding of intentional infliction of emotional distress "requires that the conduct be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir.1985) (citations omitted). "The conduct must also be intentionally directed at the plaintiff and lack any reasonable justification." *Id.*

Plaintiff cannot prevail on this claim, for at trial he produced no evidence tending to prove either that defendants' conduct met this heavy standard of outrageousness or that defendants' conduct was intentionally directed at plaintiff.

## COUNTERCLAIMS

Defendants assert two counterclaims. The first alleges that plaintiff commenced this action in bad faith to harass defendants, the second alleges that plaintiff has slandered defendants. Defendants offered insufficient proof at trial to prevail on either of these claims, and they are accordingly dismissed.

## CONCLUSION

Having heard the witnesses and resolved the issues of credibility, I decide and find that the plaintiff has failed to sustain his burden of proof on any of the allegations raised at trial or in the complaint. Accordingly, the complaint is dismissed; however, plaintiff's contract claim is dismissed without prejudice, as indicated.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.

SO ORDERED.