UNITED STATES of America, Plaintiff,

v.

Mitchell Dennis MARKS, a/k/a Mitch, and Youseff Miri, a/k/a Joseph, Defendants.

Crim. A. No. 86–CR–80641–DT.

United States District Court, E.D. Michigan, S.D.

Jan. 20, 1988.

Brian M. Legghio, Mark A. Miller, Asst. U.S. Attys., Detroit, Mich., for plaintiff.

Martin S. Baum, Harold Z. Gurewitz, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

This case is before the Court on the objections of the Defendant, Mitchell Dennis Marks ("Marks"), to Magistrate Paul J. Komives' Report and Recommendation concerning his Motion to Suppress Evidence and Motion to Dismiss Indictment.

The Court will address Marks' objections on each motion in turn, beginning with the motion to dismiss.

## I. MOTION TO DISMISS

### Introduction

Marks was arrested in the Detroit area early on the morning of August 6, 1986, and charged with violating 21 U.S.C. §§ 841(a)(1) and 846, which prohibit, *inter alia*, the sale and distribution of cocaine. In the days that followed, Marks and his then attorney, William Swor ("Swor"), held negotiations with Government representatives, DEA special agent Fred Ganem ("Ganem") and Assistant U.S. Attorney Brian Legghio ("Legghio"), who were seeking Marks' cooperation in their investigations of other persons suspected of drug trafficking.

Marks' motion to dismiss contends that after a "series of meetings" between Marks, Swor, and the Government, "an

agreement was reached ... providing that [Marks] would not be prosecuted for the December, 1985 transaction in return for his cooperation." Defendant's memo at 2.

On August 12, 1986, the then pending federal criminal complaint against Marks was dismissed. However, on February 11, 1987, Marks was arrested a second time, and the earlier complaint was reinstituted. Marks, thereupon, moved to dismiss that complaint, claiming a breach of a purported agreement not to prosecute. After an evidentiary hearing, Magistrate Paul F. Komives denied Marks' motion to dismiss. Thereafter, Marks filed the instant appeal from the Magistrate's decision.

In his appeal, Marks reasserts his claim that "the Government [failed] to live up to an agreement reached prior to the present indictment providing for no prosecution in return for cooperation." Memorandum in support of defendant's objections to magistrate's order at 1. The question presented for a decision by this Court is the same one presented to the Magistrate: whether an agreement not to prosecute existed in this case.

Under *United States v. Raddatz*, 447 U.S. 667, 673–74, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980), it is the duty of the district court to reconsider (though not necessarily to rehear) a magistrate's actions *de novo* where credibility is at issue. This Court determined, after an examination of the record, that a rehearing was required to permit an evaluation of the credibility of the parties to the alleged agreement.

In a hearing, which was held in several installments beginning November 2, 1987, and ending December 17, 1987, this Court heard sharply conflicting testimony concerning (1) Marks' August 1986 negotiations with the Government, and (2) the existence and extent of, and possible compliance with, any agreement that the parties may have reached under which Marks might escape prosecution arising from his August 6, 1986 arrest.

### Undisputed facts

The Court notes that certain contents of the negotiations between Marks and the Government are undisputed:

1. The Government, through its representatives Ganem and Legghio, was primarily interested in Marks' cooperation against Marvin Mulligan ("Mulligan"), Fred Kalel ("Kalel"), and Alex Rudoi ("Rudoi"), all of whom the Government believed to be friends and narcotics associates of Marks.

2. The Government hoped that Marks would cooperate in a "pro-active" way (*i.e.* by "wearing a wire," or body microphone and tape recorder, and by agreeing to testify) against Mulligan, Kalel and/or Rudoi, all of whom the Government wished to investigate.

3. Marks refused to agree to "wear a wire" or testify against anyone, and furthermore refused to cooperate at all, "pro-actively" or otherwise, against Mulligan, Kalel or Rudoi.

4. Marks was willing to cooperate, though without "wearing a wire" or testifying, against (a) an Italian group of drug importers in Windsor, (b) a similar group in East Lansing, (c) Chester Campbell ("Campbell"), and (d) Lenny Tyson ("Tyson"). These last two individuals were of at least some interest to the Government during the negotiations which led to the alleged agreement.

5. No written memorial of the purported agreement was ever made, and none presently exists.

There is conflicting testimony as to virtually all other facts at issue in the case, including (1) the precise number, dates, and duration of the relevant negotiation meetings, (2) whether, or under what circumstances, Marks' cooperation as to Tyson and Campbell could have satisfied the Government, (3) if so, whether "pro-active" cooperation was required, or whether forms of cooperation which were less objectionable to Marks could have sufficed, (4) whether the Government would ever have allowed Marks to escape prosecution altogether, no matter how great the extent of his cooperation, and (5) whether the Government honestly represented its wishes and intentions to Marks and Swor, either at the time of the negotiations or afterward.

*Findings of fact*

After a careful examination of all of the evidence in the record, the Court finds the following facts:

1. Marks was arrested at about 2:30 a.m. on August 6, 1986, while driving home from his job as manager of the "Collars and Cuffs" lounge in Windsor, Ontario. He spent the night in custody, and the next morning met with his attorney, William Swor, and later that day met with Ganem, Legghio, and Assistant U.S. Attorney Robert Monk ("Monk") at the Federal Building.

2. At this meeting, Marks was allowed to hear the Government's principal evidence against him (to wit, audiotape recordings of himself which Agent Ganem had made while under cover). The group discussed Marks' possible cooperation as an alternative to prosecution on the basis of the tape-recorded evidence. After Marks and Monk clashed during this discussion, Monk left the meeting and was not further associated with Marks' case. Marks was told at this meeting that if he cooperated "pro-actively" against Marvin Mulligan, the pending charges would be permanently dismissed and Agent Ganem's audiotapes of him would be destroyed.

3. The parties shared the understanding that, in Swor's words, Marks "could walk away unscathed for some level of cooperation." In that spirit, the parties met on at least two other occasions to continue negotiations concerning what "level" of cooperation Marks was willing to offer. Two such meetings, each at midday and under one hour in duration, were held at the My Town lounge in Detroit within several days after Marks' arrest.

4. At these meetings, the Government disclosed that its primary investigative targets were Mulligan, Kalel, and Rudoi. Ganem and Legghio informed Marks that securing the non-prosecution of the pending complaint would require his "wearing a wire" and testifying in court against one or more of these named investigative targets. The Government conducted its negotiations in the belief that Marks was involved in narcotics with one or more of these three persons.

5. Marks adamantly refused to cooperate in the manner requested (*i.e.*, by "wearing a wire" or testifying in court against Mulligan, Kalel and/or Rudoi). Marks wished to cooperate only to the extent possible without discovery by *anyone*—not only those against whom he might inform—of the fact that he was cooperating with the Government in exchange for the non-prosecution of felony drug charges against him.

6. The Government persisted in negotiating, in the hope that Marks would eventually agree to cooperate "pro-actively" to secure non-prosecution. The Government stated to Marks several times during negotiations that "the door [was] open" to a possible future agreement.

7. The Government did suggest during negotiations, contrary to its representations before this Court, that Marks would be granted full transactional immunity—*not* merely a favorable plea agreement—if he cooperated to the Government's satisfaction. However, the Government did not specify the terms of any future agreement beyond the basic demand that Marks "wear a wire" and testify against Mulligan, Kalel and/or Rudoi in order to escape prosecution. The Government's negotiations were an effort, in Marks' own words, to "see how far [he] would go" toward accepting the Government's demands in exchange for non-prosecution.

8. At one or both of the two My Town meetings, the Government presented a list of persons in addition to Mulligan, Kalel and Rudoi in whom it had an investigative interest. This list included Tyson, Campbell, and Otis Culpeper ("Culpeper"). The names Tyson, Campbell and Culpeper thus formed at least some common ground between Marks and the Government.

9. Marks expressed a willingness to gather and provide information as to one or more of these three persons, although he steadfastly refused to cooperate "pro-actively" against them or against anyone.

10. Legghio indicated at one or both of the two My Town meetings that Marks would receive "credit" in any future agreement for any act of cooperation he per-

formed, whether or not it was in conformity with the Government's stated conditions for non-prosecution. However, Legghio's use of the word "credit" was not intended to convey to Marks that he could escape prosecution altogether in return for less than "pro-active" cooperation against the Government's preferred investigative targets.

11. As a show of its good faith, and because it believed that, due to pending cooperation talks, there would be no indictment in Marks' case within the requisite 30-day period following his arrest, the Government dismissed its then pending criminal complaint against Marks on August 12, 1986.

12. Shortly after this dismissal, and within a few days following the My Town meetings, there was a final negotiation meeting at the Federal Building, at which Ganem, Legghio, Marks and Swor were present. At this final meeting, Marks was asked how he would be willing to cooperate if not in the manner originally requested.

13. At this final meeting, mention was made of Marks' possible cooperation, on less than a "pro-active" level, against those persons about whom Marks was willing to gather and provide information. Legghio went so far as to state at this meeting that "historical testimony" was useful to the Government where it could not obtain direct testimony about, and audiotapes of, illegal acts. However, Marks refused to cooperate, even by agreeing to give "historical testimony," against Mulligan, Kalel or Rudoi, the Government's preferred investigative targets.

14. All four participants left the meeting with the understanding that no further meetings would be held.

15. Marks left this final meeting with the firm belief that the Government had agreed (a) to return the Ganem audiotapes, and (b) never to prosecute him for crimes charged in the August 6, 1986 arrest on the condition that Marks provide information against Tyson, Campbell, "any white suburban drug dealer," and/or the source or sources of leaks of the DEA's confidential information from within that agency's Detroit office.

16. Swor left this final meeting with the understanding that the Government had dismissed its complaint against Marks in exchange for his client's promise to provide the Government with information which would be sufficient to convict one or more of the above persons. When this meeting ended, Swor had no belief that the tapes would be returned. He was not certain that dismissal of the complaint would be permanent. Moreover, Swor did not know precisely how Marks was to communicate his confidential information to the Government, or what responsibility, if any, he as Marks' attorney bore with regard to such communication.

17. Both Ganem and Legghio left this final meeting with the belief that no agreement had been reached, and that the Government had made no commitment to Marks to refrain from prosecuting him on any criminal charge, except by dismissing the original complaint, an act which the parties knew had already been performed prior to the final meeting.

18. Between September 1986 and February 1987, Marks and Swor both made attempts to contact the Government in an effort to convey information which they believed was of value to the Government in its various pending criminal investigations.

19. The Government several times failed to respond to these contacts. When it did respond, the Government indicated to Marks and/or Swor that it had no investigative interest in the proffered information. On one occasion when Marks reached Ganem by telephone, on December 12, 1986, Ganem instructed Marks to communicate with him only through Swor.

20. Neither Marks nor Swor were told that since there was no agreement between Marks and the Government, their contacts were unwelcome. This silence reinforced Marks' and Swor's belief that a cooperation/non-prosecution agreement was in effect.

21. However, in failing to respond to the contacts with the degree of promptness and interest which Marks and Swor believed was warranted under the circumstances, the Government did not act in bad

faith or otherwise violate any understanding between the parties.

22. On February 17, 1987, Marks was arrested and charged with federal narcotics violations independent of those charged in the arrest of August 6, 1986. Although Marks had attempted to contact the Government prior to this arrest, and honestly believed that his actions of February 17, 1987 would serve his interest in escaping prosecution on the charges of August 6, 1986, no Government agency or official had authorized Marks to engage in otherwise illegal conduct for any reason. Marks admitted that his actions on February 17, 1987, were "stupid."

### Conclusions of law

The Court will first address whether the facts of this case present an agreement not to prosecute. It will then examine whether the facts of this case present a violation of Marks' right to due process of law under the Fifth Amendment to the United States Constitution.

■ A. Agreements between a criminal defendant and the prosecution, either plea agreements or agreements not to prosecute, are governed by contract principles. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971) (the Government cannot break, even inadvertently, its promises in plea bargaining with defendants); *Plaster v. United States,* 789 F.2d 289, 295 (4th Cir.1986) (applying *Santobello* to non-prosecution agreements).

In civil contract cases, "[a] plaintiff has the burden of proof to establish by a fair preponderance of credible evidence the existence of the contract ..." *PolyGram Records, Inc., v. Buddy Buie Productions, Inc.,* 520 F.Supp. 248, 252 (S.D.N.Y.1981) (Weinfeld, J.). This Circuit has held that the existence of an express oral contract between merchants must be proven by clear and convincing evidence. *Industrial Equipment co. v. Emerson Electric Co.,* 554 F.2d 276 (6th Cir.1977); *accord, Tipton v. Woodbury,* 616 F.2d 170 (5th Cir.1980).

■ The Government must honor an agreement not to prosecute "where it appears from the record that (1) an agreement was made; (2) the defendant has per-

formed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, ... assisted with the investigation." *Rowe v. Griffin,* 676 F.2d 524, 527 (11th Cir.1982). Without reaching the second and third elements of the *Rowe v. Griffin* test, this Court concludes that to satisfy the first element, a criminal defendant bears the burden of persuading this Court, by at least a preponderance of the credible evidence, that an agreement existed.

B. The Court now considers the direct and circumstantial factual evidence of record on the agreement question.

■ In his testimony, Marks stressed that he had refused to cooperate "pro-actively" from the beginning, but that the Government had continued negotiations even in the face of this refusal. However, this evidence does not compel the inference that the Government was willing to enter an agreement which called for less than "pro-active" cooperation.

The fact that there were three, four, or even five meetings between Marks and the Government tends to show that both parties were interested in an agreement, but it does not establish, even circumstantially, the content of those meetings. It certainly does not prove the existence of an agreement.

Similarly, the fact that the pending complaint against Marks was dismissed on August 12, 1986, does not by itself imply a commitment by the Government to refrain permanently from prosecuting that complaint.

The Court notes that section 3161(b) of the Speedy Trial Act, 18 U.S.C. § 3161(b), requires any indictment to be brought within 30 days of the summons or complaint in a federal criminal case. The Government may dismiss a criminal complaint voluntarily if it believes that an indictment will not be brought in time to satisfy the 30-day limitation of section 3161(b). No indictment was pending in the instant case at the time that the instant negotiations were held. Furthermore, testimony before this Court showed that the complaint against

Marks was dismissed before the parties met for the last time, and that the dismissal "was not the basis" for whatever agreement Marks alleged was reached at his last meeting with the Government.

Thus, the dismissal of the complaint tends to show only that the Government was not certain, as of August 12, 1986, that it would bring its indictment within 30 days following the issuance of the original Marks complaint. The dismissal is only attenuated circumstantial evidence that Marks had reached a non-prosecution agreement with the Government.

Marks also introduced evidence of his efforts, as well as those of Swor, to comply with the terms of the alleged agreement after the negotiations had ended. The Court notes that compliance itself is not placed in issue until and unless an agreement is first found to have existed. However, when viewed as a part of Marks' proofs on the agreement question, the compliance evidence—like the other evidence discussed above—is unpersuasive. At most, evidence of Marks' efforts to reach the Government with certain "tips" only proves that Marks tried to comply with what he thought was an agreement. Such evidence, without more, does not prove that an agreement actually existed. To hold otherwise would be tantamount to requiring the Government to renounce what it believed were unsolicited "tips" merely to avoid the appearance that the information had been taken in exchange for prosecutorial favors. This Court cannot so hold and still permit federal law enforcement agencies to exercise their legitimate investigative function.

In connection with Marks' evidence of compliance with the purported agreement, the Court takes particular note of the actions of Swor, a member of the bar of this District with fifteen years' experience in federal criminal defense litigation. It is undisputed that Swor knew, at least after December 12, 1986, that Marks had been told to communicate with the Government exclusively through counsel. If an agreement had actually existed, Swor would have exercised considerably more diligence than he did during the period of alleged "compliance," both in his efforts to contact the Government and in his efforts to clarify the nature and scope of the agreement for himself and for his client.

In short, the Court believes that the circumstantial evidence of record, considered in its totality, is entirely too equivocal to warrant the inference that Marks and the Government reached an agreement under which Marks was to escape prosecution in return for cooperation.

C. The Court now turns to the direct testimony relating to the alleged agreement.

■ The testimony of the four witnesses, Marks, Swor, Ganem and Legghio, is fraught with inconsistencies and open contradictions. Marks testified that there was an agreement, and specifically stated its provisions. Swor testified, much more vaguely than did Marks, that there was an "understanding." However, he was unable to specify its terms. Ganem and Legghio both testified that there was no agreement at all.

Given these conflicts in the testimony, a finding that all four witnesses were credible would logically compel a conclusion that the parties had differing interpretations of the outcome of the negotiations. By definition, this divergence does not constitute a meeting of the minds, and this Court would be unable to find an agreement. To find that an agreement did exist would require the Court to credit Marks' version of events, ignore the ambiguities in Swor's version, and discredit Ganem's and Legghio's versions entirely.

This Court finds that Marks honestly believed an agreement existed, but finds Marks' testimony credible only as a reflection of his beliefs and not as proof that an agreement actually existed. In evaluating Marks' credibility, the Court considers that he was the only witness who testified that a true immunity agreement had been achieved. The Court must recognize that Marks' interests were served in August, 1986, by believing that an agreement had been achieved which would allow him to "cooperate" on his own terms. Those same interests are certainly served now by testifying to an agreement before this Court.

The Court also finds that Swor honestly believed that an understanding had been reached. However, Swor's testimony persuades this Court only that the Government stated that Marks could escape prosecution in exchange for some level of cooperation. Since this was the Government's position at the start of negotiations, Swor's testimony on this point proves nothing concerning any agreement which altered this position.

Indeed, Swor's inability to offer further evidence of the terms of the alleged agreement reinforces the Government's contentions that (a) the Marks negotiations collapsed without an agreement, (b) it was taken for granted that, in an eventual plea agreement, Marks would get "credit" for his cooperation he offered, and (c) at the close of talks, the door was left open to a future non-prosecution *or* future plea agreement should Marks change his mind about "pro-active" cooperation on the Government's stated terms.

Undisputed evidence of the discussions between Marks and the Government strongly suggests that by the time negotiations ended, the raw materials for an agreement were available to the parties on the basis of the "common ground" alluded to earlier in this opinion. However, the Court finds the testimony of Legghio and Ganem as to their belief (to wit, that when talks ended, no agreement had actually been achieved) to be credible. Under the circumstances, therefore, no meeting of the minds can be found to have existed between the Government and Marks.[1]

D. There remains the question whether the evidence of record discloses an agreement by estoppel. To prove such a contract, Marks would have to show that he had relied to his detriment on a promise by the Government. American Law Institute, Restatement 2d of Contracts section 90 (1979); *see also* American Law Institute, Restatement 2d of Torts, sections 874, 890 (1982).

As persuasive evidence to support an estoppel theory in this case, the Court would accept proof that the Government (a) behaved as though there were an agreement between the parties, or (b) knew of Marks' belief that an agreement existed, but did nothing to disabuse Marks of that notion.

■ However, the Government's mere failure to announce, in the months following the cessation of negotiations, that no agreement existed, is conduct which is far too equivocal to create an agreement by estoppel.

Since Marks introduced no evidence whatever that the Government knew of his belief in an agreement, he cannot claim that the Government's failure to correct his mistaken impression created an agreement *ex post.* Marks introduced no other relevant evidence on this question, except to beg that question by referring to his actions after negotiations ended as "compliance."

Had Marks or Swor explicitly conveyed to the Government a belief that an agreement was in force or a belief that the Government was violating that agreement, and had the Government still failed to make a disclaimer under those circumstances, there might have been a basis for the invocation of an estoppel theory. However, given the thoroughly equivocal facts presented here, the law does not allow this Court to find a non-prosecution agreement, either express, implied or by estoppel.

### Defendant's constitutional claim

The Court next addresses a constitutional question that was raised by Marks during hearings on the instant motion to dismiss. He suggested that the Government's breach of an agreement not to prosecute in this case was a violation of Marks' due process rights under the Fifth Amendment to the United States Constitution because it was "outrageous" and offended the "fundamental fairness" standard of *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and *Unit-*

---

1. The Court notes the holding of *United States v. Dempsey,* 733 F.2d 392, 396 (6th Cir.1984), that "the credibility determination of the district judge [on the question of the existence of a non-prosecution agreement] is entitled to great deference and his finding of fact may not be set aside unless clearly erroneous."

ed States v. Robinson, 763 F.2d 778 (6th Cir.1985).

In his original Motion to Dismiss Indictment, Marks avers that "regardless of what [Legghio and Ganem] said, they were unwilling to accept anything less than what they originally wanted, *i.e.* information about [Mulligan]." Marks argues that his case is "a classic set-up." He also contends that the Government "strung [him] along"—permitting him to believe that an agreement existed with the Government, and ultimately authorizing him to engage in criminal activity in the fulfillment of that agreement. Marks submits that the Government purposefully and improperly acted in this manner merely in the hope of arresting him again, thereby weakening his bargaining position and forcing him to cooperate against an old friend in a manner which was distasteful to him.

In his motion, Marks asserts that such conduct by the Government is "reprehensible," and meets the "outrageousness" test of *Russell* and *Robinson* under the Fifth Amendment's due process clause.

If the evidence had shown the Government to have committed such subterfuge upon Marks, this Court might well entertain a claim of "outrageousness" which would be sufficient to violate due process under the Fifth Amendment. Similarly, if Marks had persuaded the Court that he had relied upon a proven agreement with the Government as license to engage in certain later illegal acts, the Court might discern a Fifth Amendment violation in the Government's subsequent failure to admit the agreement's existence.

However, this Court has already found that the facts of record establish no agreement not to prosecute, and no bad faith by the Government in failing to abide by the alleged agreement or in failing to warn Marks that his belief was mistaken. It follows from this Court's findings and conclusions that (1) Marks' actions of February 17, 1987, were not in reliance on a proven agreement, and (2) no set-up, outrageous conduct, or Fifth Amendment due process violation has occurred.

For the foregoing reasons, this Court determines that Marks' Motion to Dismiss Indictment must be denied.

## II. MOTION TO SUPPRESS EVIDENCE

■ The Court now turns to Marks' objections to the Magistrate's Report and Recommendation concerning his Motion to Suppress Evidence. With the amplifications discussed below, the Court hereby adopts the Magistrate's Report on the evidence motion.

The Magistrate's Report states, "Defendant's Motion [to Suppress Evidence] is addressed to materials found at 2525 Leroy Lane, Orchard Lake, Michigan on August 6, 1986. These included a triple beam balance scale, a Ruger Carbine 44 caliber long gun, and several boxes of miscellaneous records or documents." The search which yielded these items was conducted the day after Marks' first arrest, August 6, 1986, under a warrant issued by Magistrate Steven Pepe. He based its issuance on an affidavit of Agent Ganem which stated, *inter alia,* the following:

a) Marks was "identified as a significant heroin and cocaine trafficker capable of distributing multi-kilogram quantities of both substances." (Affidavit paragraph 3.)

b) Marks was "observed [by an informant during a personal visit to Marks' house] to be in possession" of 1 kg. of cocaine in December 1985.

It is evident from Ganem's affidavit that he was the undercover agent in whose presence Marks allegedly stated—while the conversation was being recorded surreptitiously—that his residence would be a safe "stash house" and that he had held large amounts of cash for drug-dealing associates.

Ganem also stated that he had been informed by an IRS agent that there were no federal or Michigan returns on file for Marks or his wife, or corporate returns for two companies which were headquartered at Marks' home address, for the 1981 through 1985 calendar years, and that no source of legitimate income could be found, even though Marks lived in a Bloomfield Hills house and owned a Jaguar. The bal-

ance of the affidavit consists of assertions by Ganem, based on his and the IRS agent's experience, that certain evidence would likely or normally be found at Marks' house under the attested circumstances.

The Magistrate used the evidence in Ganem's affidavit to support a finding of probable cause—not on direct evidence that there were narcotics in the house on the date of search, but on an inference of a "pattern of continuing criminal activity" which was suggested in the affidavit. *See United States v. Williams*, 351 F.2d 475 (6th Cir.), *cert. denied*, 383 U.S. 917, 86 S.Ct. 910, 15 L.Ed.2d 671 (1965) (allowing a pattern of continuing criminal activity to support a finding of probable cause). The principle that continuing criminal activity can constitute probable cause is not contested by Marks.

The question for the Court, in reviewing the Magistrate's Report, is whether Ganem's affidavit affords a sufficient basis for a finding of probable cause. Specifically, the Court must inquire whether the averments of the affidavit amounted to probable cause to believe, despite staleness objections, that Marks was engaged in, and his home was the scene of, a pattern of continuing criminal activity leading up to the date of the warrant at issue.

Ganem's evidence was of his and an informant's contacts with Marks in December 1985 and January 1986. The search was conducted on the day after the arrest (to wit, August 7, 1986) based on a warrant which had been issued hours or days before the arrest. Even assuming that a "pattern" warrant would be stale without evidence of more recent date than January 1986, this Court finds that at least some of the evidence within the affidavit was of events or activities between January 1986 and August 1986.

That evidence is contained in Paragraph 26 of the affidavit, and is derived from conversations of June and July 1986 between Ganem and Marks' now fugitive co-defendant, Youseff Miri. Miri told of Marks' recent receipt of large amounts of cash. Miri further stated that he had been told by Marks' wife in June that the couple had no need of money, had no budget, used no bank, and were in the process of applying for a mortgage on their West Bloomfield home. While this compound hearsay is hardly sufficient evidence to establish conclusively that Marks was dealing in drugs after January 1986, it does constitute recent evidence of suspicious activities like those for which earlier evidence existed, and thus offers "common-sense" help in determining probable cause under *United States v. Jenkins*, 728 F.2d 396, 397–98 (6th Cir.1984), *citing United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) ("affidavits for search warrants ... must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion").

Moreover, even if this Court concluded that there was insufficient evidence as a matter of law for the August 6, 1986 warrant to issue, the "good faith" exception to the exclusionary rule, *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), would require this Court to uphold the search on the ground that the searching officers reasonably relied on a warrant which they believed in good faith was valid.

For the foregoing reasons, the evidence which was seized in the August 7, 1986 search of Marks' home cannot be suppressed, and his Motion to Suppress Evidence must be denied.

IT IS SO ORDERED.